UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ELIZABETH N. W.[1], | ) |
|         Plaintiff, | ) |
| v. | ) Case No. 3:21-cv-008 |
| KILOLO KIJAKAZI[2], | ) |
| Acting Commissioner of Social Security, | ) |
|         Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Elizabeth W., on January 5, 2021. For the following reasons, the decision of the Commissioner is **REMANDED.**

*Background*

The plaintiff, Elizabeth W., filed applications for Child Disability Benefits on February 13, 2019, and Supplemental Security Income on February 1, 2019, alleging a disability onset date of March 1, 2008. (Tr. 37). However, for the Title II Child Disability Benefits, benefits are not available until the month a claimant attains age 18. Therefore, the earliest date in which Elizabeth W. would have been eligible for benefits was August 6, 2018, when she attained the age of 18. (Tr. 37). The Disability Determination Bureau denied Elizabeth W.'s applications initially on March 25, 2019, and again upon reconsideration on July 8, 2019. (Tr. 37). Elizabeth W. subsequently filed a timely request for a hearing on August 22, 2019. (Tr. 37). A hearing

---

[1] To protect privacy, the plaintiff's full name will not be used in this Order.
[2] Andrew M. Saul was the original Defendant in this case. He was sued in his capacity as a public officer. On July 9, 2021, Kilolo Kijakazi became the acting Commissioner of Social Security. Pursuant to **Federal Rule of Civil Procedure 25(d)**, Kilolo Kijakazi has been automatically substituted as a party.

was held on May 22, 2020, before Administrative Law Judge (ALJ) Marc Jones via telephone due to the Coronavirus pandemic. (Tr. 37). Vocational Expert (VE) Thomas Grzesik also appeared at the hearing. (Tr. 55). The ALJ issued an unfavorable decision on June 4, 2020. (Tr. 37-47). The Appeals Council denied review making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

First, the ALJ noted that Elizabeth W. was born on August 7, 2000, and had not attained the age of 18 as of August 6, 2018, the earliest date she would have been eligible for benefits under the claims filed. (Tr. 40). At step one of the five-step sequential analysis for determining whether an individual is disabled, the ALJ found that Elizabeth W. had not engaged in substantial gainful activity since August 6, 2018, the first day she was eligible for benefits. (Tr. 40).

At step two, the ALJ determined that Elizabeth W. had the following severe impairments: anxiety, bipolar disorder, and depression. (Tr. 40). The ALJ found that the above medically determinable impairments significantly limited Elizabeth W.'s ability to perform basic work activities. (Tr. 40). Elizabeth W. also alleged disability due to obesity. (Tr. 40). However, the ALJ indicated that her obesity caused no more than a minimal limitation on her ability to engage in basic work activities, and therefore it was considered a non-severe impairment. (Tr. 40).

At step three, the ALJ concluded that Elizabeth W. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 40). The ALJ found that no medical evidence indicated diagnostic findings that satisfied any listed impairment. (Tr. 40-41).

After consideration of the entire record, the ALJ then assessed Elizabeth W.'s residual functional capacity (RFC) as follows:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple work-related decisions and simple, routine tasks with no assembly line work or strictly enforced daily production quotas, and few changes in a routine work setting; she can never interact with the general public; she can work in proximity to co-workers, but only with brief, incidental interaction with co-workers and no tandem job tasks requiring cooperation with co-workers to complete the task and she could work where supervisors occasionally interact with her throughout the work day.

(Tr. 42). The ALJ explained that in considering Elizabeth W.'s symptoms, he followed a two-step process. (Tr. 42). First, he determined whether there was an underlying physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Elizabeth W.'s pain or other symptoms. (Tr. 42). Then he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Elizabeth W.'s functioning. (Tr. 42).

After considering the evidence, the ALJ found that Elizabeth W.'s medically determinable impairments reasonably could have caused some symptomology. (Tr. 22). However, he found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 43). The ALJ found the state agency psychologist opinions persuasive with regard to the paragraph B criteria. (Tr. 45).

At step four, the ALJ found that Elizabeth W. had no past relevant work. (Tr. 46). However, the ALJ found jobs that existed in significant numbers in the national economy that Elizabeth W. could perform. (Tr. 46-47). Therefore, the ALJ found that Elizabeth W. had not been under a disability, as defined in the Social Security Act, from March 1, 2008, her alleged onset date, through the date of this decision. (Tr. 47).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Wilder v. Kijakazi***, __ F.4th __ (7th Cir. 2022); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting ***Consol. Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see* ***Wilder***, __ F.4th at __. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.

**20 C.F.R. § 404.1520**. The ALJ first considers whether the claimant is presently employed and "doing . . . substantial gainful activity." **20 C.F.R. § 404.1520(b)**. If she is, the claimant is not disabled, and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c)**; *see* ***Williams v. Colvin***, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. § 404.1520(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f);** *see* ***Biestek v. Berryhill,*** 139 S. Ct. 1148 (2019) (upon the disability benefits applicant's request, vocational expert's refusal to provide the private market-survey data underlying her opinion regarding job availability does not categorically preclude the expert's testimony from counting as "substantial evidence" but, instead, the inquiry is case-by-case).

Elizabeth W. has requested that the court remand this matter for additional proceedings. In her appeal, Elizabeth W. argues that the ALJ's RFC was not based upon substantial evidence.

5

Specifically, she alleges that the ALJ erred in evaluating the medical opinions as well as in evaluating her subjective symptoms as required by SSR 16-3p and that the Appeals Council erred in failing to consider the new evidence.

Of the three arguments, the court finds it necessary to address only the second: the ALJ erred in analyzing her subjective symptoms. An ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong. **Shideler v. Astrue**, 688 F.3d 306, 310-11 (7th Cir. 2012). Nevertheless, an ALJ must explain his evaluation with specific reasons that are supported by the record. **Pepper v. Colvin**, 712 F.3d 351, 367 (7th Cir. 2013). Under SSR 16-3p, 2016 SSR LEXIS 4, an ALJ must assess the claimant's subjective symptoms rather than assessing her "credibility."

The ALJ first must determine whether the claimant has a medically determinable impairment that reasonably could be expected to produce her symptoms. SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *2. Then, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *2. An individual's statements about the intensity and persistence of the pain may not be disregarded because they are not substantiated by objective medical evidence. SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029 at *5. In determining the ability of the claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. SSR 163-p, s016 SSR LEXIS 4, 2016 WL 1119029, at *4, 9. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

    (i)       The individual's daily activities;

    (ii)      Location, duration, frequency, and intensity of pain or other symptoms;

    (iii)     Precipitating and aggravating factors;

    (iv)     Type, dosage, effectiveness, and side effects of any medication;

    (v)      Treatment, other than medication, for relief of pain or other symptoms;

    (vi)     Other measures taken to relieve pain or other symptoms;

    (vii)    Other factors concerning functional limitations due to pain or other symptoms.

See **20 C.F.R. § 404.1529(c)(3)**.

The ALJ must justify his assessment with "specific reasons supported by the record." **Pepper v. Colvin**, 712 F.3d 351, 367 (7th Cir. 2013). Moreover, "the ALJ must explain h[is] [subjective symptoms evaluation] in such a way that allows [the Court] to determine whether []he reached h[is] decision in a rational manner, logically based on h[is] specific findings and the evidence in the record." **Murphy v. Colvin**, 759 F.3d 811, 816 (7th Cir. 2014); see SSR 16-3p, 2016 SSR LEXIS 4, 2017 WL 5180304, at *10 (Oct. 25, 2017) (The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms"). "[T]he absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to disregard those accounts." **Ghiselli v. Colvin**, 837 F.3d 771, 777 (7th Cir. 2016); see also **Moore v. Colvin**, 743 F.3d 1118, 1125 (7th Cir. 2014) ("[T]he ALJ erred in rejecting [the plaintiff]'s testimony on the basis that it cannot be objectively verified with any reasonable degree of certainty. An ALJ must consider subjective complaints of pain if a claimant has established a medically determined impairment that could reasonably be expected

7

to produce the pain").

In assessing Elizabeth W.'s subjective symptoms, the ALJ found that her statements about the intensity, persistence, and limiting effects of her symptoms "[we]re inconsistent with the overall evidence."  (Tr. 43).  The ALJ noted that her therapy notes "typically include[d] only the claimant's complaints … [and] d[id] not include mental status examinations."  (Tr. 43).  The ALJ noted that mental status examinations showed that she was neatly dressed, cooperative, responded to questions appropriately, had intact cognitive functioning, and organized thought processes.  (Tr. 43).  The ALJ stated that her mood was "euthymic and only mildly anxious," and that although there was "some mention of hallucinations," it was not a regularly noted issue in 2018.  (Tr. 43).

Later in the decision, the ALJ stated that he accounted for Elizabeth W.'s reported struggles with fluctuating symptoms.  (Tr. 44).  The ALJ stated that he accounted for her difficulty with motivation by limiting her to simple type work with no strictly enforced daily production quotas, few changes in a routine setting, and no tandem tasks.  (Tr. 44).  He also stated that he accounted for her anxiety and paranoia/hallucinations by placing limits in social function and limiting her to simple type work.  (Tr. 44). The ALJ also noted that despite continued reports of paranoia, depression, anxiety, difficulty with sleep and anger, her mental status examinations remained normal, and that in April 2019 she reported doing better.  (Tr. 44).

As an initial issue, the ALJ rejected Elizabeth W.'s subjective symptoms, in part because the treatment notes that supported her symptoms did no more than rely on her subjective complaints.  However, mental health treatment must, by its nature, rely on statements from the patient. *See **Navarro v. Berryhill***, 217 WL 5981198, at *4 (N.D. Ill. Nov. 29, 2017) (finding that "psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of

8

subjective patient complaints") (internal citations omitted).  "How else is a psychologist to evaluate a patient's mental illness, other than talk to [her]?  Depression does not show on an x-ray."  *Worzalla v. Barnhart*, 311 F.Supp. 2d 782, 797 (E.D. Wis. 2004).  Elizabeth W.'s clinicians must rely on both her subjective statements and the statements of her parents in determining how to treat her.  The ALJ failed to explain which of Elizabeth W.'s symptoms were unsupported by the record, and he failed to properly explain how her treating physicians and nurse practitioners erred in relying on her (and her mother's) reports of her symptoms.

The ALJ continued by stating that Elizabeth W.'s mental status examinations that were not based on her subjective symptoms showed more stable functioning.  The ALJ noted that these examinations showed that she was neatly dressed, cooperative, responded to questions appropriately, had intact cognitive functioning, and organized thought processes.  (Tr. 43).  The ALJ found that Elizabeth W. had a euthymic mood and that she was only mildly anxious.  (Tr. 43).  He also found that although there was "some mention of hallucinations," that was not a regularly noted issue in 2018.  (Tr. 43).  This description of Elizabeth W.'s mental health treatment ignores vast amounts of evidence to the contrary.

An ALJ must "articulate at some minimal level [his] analysis of the evidence" and may not "ignore an entire line of evidence that is contrary to [his] findings."  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001), *quoting* *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999), *Clifford v. Apfel* 227 F.3d 963, 972 (7th Cir. 2000).  An ALJ "cannot simply cherry-pick facts surrounding a finding of non-disability while ignoring evidence that points to a disability finding."  *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) (finding that the claimant cannot "prevail by arguing that the ALJ improperly weighed the evidence" but can prevail if the "ALJ overlooked entire swaths of it.").  Therefore, "an ALJ's decision cannot stand if it lacks

evidentiary support or an adequate discussion of the issues. **Suetkamp v. Saul**, 406 F.Supp.3d 715, 719 (N.D. Ind. Aug. 27, 2019), *citing* **Lopez ex rel. Lopez v. Barnhart**, 336 F.3d 535, 539 (7th Cir. 2003).

The ALJ stated that Elizabeth M. had euthymic mood and was only mildly anxious. (Tr. 43). However, that language is only in a single treatment note from June 2018. (Tr. 431). Moreover, the ALJ has misunderstood how "euthymic mood" is defined with regard to bipolar disorder. A patient is euthymic in bipolar disorder when she does not currently meet the threshold for depression or mania as assessed by the diagnostic criteria. Fava, G. and Bech, P., 2015. The Concept of Euthymia. *Psychotherapy and Psychosomatics*, [online] 85(1), pp.1-5. Available at: <https://www.karger.com/Article/Pdf/441244> [Accessed 16 December 2021]. "Bipolar disorder patients spend about half of their time in depression, mania or mixed states. The remaining periods are defined as euthymic." *Id.* However, even euthymia describes periods that are "subthreshold symptomatic", and not necessarily asymptomatic or without any signs of a patient's bipolar disorder. *Id.* Moreover, throughout her therapy notes, Elizabeth W. displayed flat or restricted affect (Tr. 431, 434, 501, 503) as well as struggles with anxiety and depression (431, 446, 449, 463, 646). These symptoms and displays bely the ALJ's statements that she had a euthymic mood and only mild anxiety. The ALJ impermissibly cherry-picked a single therapy note showing euthymic mood and only mild anxiety while ignoring evidence that the clinician noted further symptoms, such as flat and restricted affect and continued anxiety and depression.

The ALJ also failed to consider the type, dosage, effectiveness, and side effects of her medications as required by the regulations. *See* **20 C.F.R. § 404.1529(c)(3).** The medical record indicated that Elizabeth W.'s medications and dosages were regularly changed and increased due to her symptoms. In May 2018, she was taking Zoloft once a day and Risperdal twice a day.

10

(Tr. 428-29). By June 2018, her Risperdal was discontinued due to adverse side effects, and she started taking Invega and Trazodone once a day in addition to Zoloft. (Tr. 431). In July 2018, her dosage of Invega was increased. (Tr. 434). In October 2018, Elizabeth W. started BuSpar twice a day for her anxiety, and her Trazodone dosage was increased. (Tr. 440). In November 2018, her Invega was increased "for mood swings, hallucinations, paranoia, anxiety, and anger issues." (Tr. 443). In December 2018, her clinician noted "she has [] not been doing well this month." (Tr. 446). Elizabeth W. reported a lot of side effects with BuSpar, so it was discontinued. (Tr. 446). However, her Invega was increased again, and her Trazodone also was increased. (Tr. 446). During her inpatient hospitalization in January 2019, her medication was changed to Latuda once a day and Trazodone once a day. (Tr. 449). Her clinician added Wellbutrin twice a day for depression and anxiety at her follow up appointment after her hospitalization. (Tr. 449-50). In February 2019, Latuda was discontinued due to side effects. She started Vraylar once a day for mood swings, depression, anxiety, and psychotic symptoms, as well as Klonopin twice a day for anxiety. (Tr. 612). Her Trazodone also was increased again at this visit. (Tr. 612). Elizabeth W. again was hospitalized due to psychiatric symptoms in March 2019. During that stay, she was put on Seroquel. (Tr. 646). At her follow up appointment, her clinician increased her Seroquel and Wellbutrin dosages. (Tr. 646). In April 2019, despite reporting that she was doing better, her clinician increased her Seroquel for mood swings, depression, anxiety, psychotic symptoms, and sleep. (Tr. 649).

  Elizabeth W.'s medications were adjusted regularly, with either medication changes or increases in dosage. The clinicians also frequently noted which of her symptoms required either medication changes or increases. For instance, in July 2018, although Elizabeth W. reported feeling better, she also began to have audio and visual hallucinations. (Tr. 434). As a result, the

clinician increased her Invega dose. (Tr. 434). At another visit, the clinician noted that her Trazodone was being increased due to continued troubles with sleeping, and BuSpar was added for her continued anxiety. (Tr. 440). Later, her Invega was increased again due to continued struggles with hallucinations, paranoia, anxiety, and anger issues. (Tr. 443). She started Wellbutrin due to depression and anxiety, which was exacerbated by the side effects of taking Latuda. (Tr. 449-50). When her Latuda was discontinued due to side effects, she was put on Vraylar for her mood swings, depression, anxiety, and psychotic symptoms. (Tr. 612). She also had her Trazodone increased due to continued struggles with sleeping, and she started Klonopin due to continued struggles with anxiety. (Tr. 612). The clinicians treating her made it clear why medications were changed or why dosages were increased. These medication changes supported Elizabeth W.'s subjective symptoms, yet the ALJ failed to discuss her medications as required by the regulations.

The ALJ also stated that "[t]here was some mention of hallucinations, but this was not a regularly noted issue in 2018." (Tr. 43). This is an inaccurate view of Elizabeth W.'s documented difficulties with visual and audio hallucinations. As an initial matter, the ALJ only referenced three pages of treatment notes regarding hallucinations. (Tr. 431, 434, 437). One of the treatment notes was from prior to the onset of hallucinations, (Tr. 431), one treatment note stated that the hallucinations were a new symptom, (Tr. 434), and the other did not discuss hallucinations outside of the boilerplate language indicating that she was not hallucinating during the therapy session. (Tr. 437). However, these are not the only records addressing Elizabeth W.'s continued struggles with visual and audio hallucinations. Throughout 2018, the clinician noted Elizabeth W.'s continued struggles with both visual and auditory hallucinations, yet the ALJ failed to acknowledge that. (Tr. 440, 443, 446, 463, 486, 501-03). Furthermore, those

discussions of her hallucinations continued into 2019. Her treatment notes showed continued hallucinations, including an increase in hallucinations in March 2019, where Elizabeth W. reported seeing shadows, animals, eyes, and dead people. (Tr. 449, 615, 646, 649). Elizabeth W.'s inpatient hospitalizations in 2019 noted both audio and visual hallucinations, including seeing "mutilated dead people." (Tr. 577-78, 585-86, 621, 623-24).

The ALJ's finding that there were only "some mention of hallucinations" that were not regularly noted to be an issue is not just a mischaracterization of the evidence, but a gross misrepresentation of the medical evidence in the record. Elizabeth W.'s auditory and visual hallucinations were noted repeatedly throughout 2018 and 2019, and they continued despite medication changes and dosage increases. The ALJ's misrepresentation of the evidence regarding Elizabeth W.'s hallucinations in finding her subjective symptoms requires remand. The ALJ "must provide a 'logical bridge' between the evidence and his conclusions." **Butler v. Kijakazi**, 4 F.4th 498, 501 (7th Cir. 2021) (citing **O'Connor-Spinner v. Astrue**, 627 F.3d 614, 618 (7th Cir. 2010)). Since there is no bridge between the evidence in the record and the ALJ's conclusion that Elizabeth W.'s statements were not entirely consistent with the evidence, the court cannot determine whether the ALJ properly analyzed the medical evidence in the record. On remand, the ALJ should perform the required analysis under SSR 16-3p.

Elizabeth W. makes other arguments regarding medical opinion evidence and new evidence on appeal. However, because the ALJ erred in failing to properly analyze her subjective symptoms, the court need not address the additional argument at this time. The ALJ's dismissal of opinion evidence due to reliance on subjective symptoms may be altered by proper analysis of those subjective symptoms. The ALJ will have the opportunity to revisit these other issues on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 31st day of January, 2022.

/s/ Andrew P. Rodovich
United States Magistrate Judge